**Edwin S. FORD et al., Trustees, Appellants,**

v.

**A. B. CULBERTSON, Appellee.**

No. 15790.

Court of Civil Appeals of Texas.

Fort Worth.

Feb. 22, 1957.

Rehearing Denied March 22, 1957.

Kilgore & Kilgore and James A. Kilgore, Dallas, for appellants.

Hudson, Keltner & Sarsgard and Luther Hudson, Fort Worth, for appellee.

BOYD, Justice.

Appellants Edwin S. Ford, Leonard S. Florsheim, Warren Wright, Jr., Lucille P. Markey, joined pro forma by her husband Gene Markey, Harry B. Sutter, and the First National Bank of Chicago, Trustees under the will of Warren Wright, deceased, and Warren Wright, Jr. and Lucille P. Markey, joined pro forma by her husband Gene Markey, individually, sued appellee A. B. Culbertson for damages for the alleged breach of a contract to purchase certain mineral royalty interests owned by the Estate of Warren Wright, deceased, in Mississippi. The case was submitted to a jury and judgment was rendered that appellants take nothing.

Appellee's offer to buy was made on January 16, 1952. He withdrew from the negotiations on November 12, 1952. Early in 1953 the Estate sold the property to Humble Oil & Refining Company for $52,141 less than appellee's offer. The suit was for that amount as damages, with interest.

Appellee pleaded several matters as defenses to the suit. Appellants challenge the judgment by many points of error. The parties have presented their contentions on all the questions by thorough briefs and oral argument. In view of our disposition of the appeal, however, it is necessary to discuss only one phase of the case, that involving the defense of defective title, as we believe that defense was established.

Appellants, through their agent William J. Sherry, caused invitations to bids for the purchase of the property to be sent to more than 200 individuals and firms, one being the Baptist Foundation of Texas, of which appellee was executive director. The Foundation was not interested, but appellee, on January 16, 1952, responded to the invitation to bid by telegram to Sherry, offering $237,605 for the property. On January 19, 1952, Sherry wrote appellee that appellants had accepted his bid. Appellants assumed that appellee was bidding for the Baptist Foundation, and Sherry asked appellee if he wanted the deeds made to the Foundation. Upon receipt of that letter, appellee called Sherry by telephone and told him that the Foundation was not concerned in the matter, and that he wanted the deeds made to Mrs. Finley and Mrs. Sarsgard and the transfer orders for the production runs made to the First National Bank in Dallas. The ladies are appellee's daughters.

Appellee immediately began an investigation of the title to the property, and, also, with his daughters and their husbands, made arrangements with the First National Bank in Dallas for the money with which to pay the purchase price. About April 1, 1952, appellee's daughters and their husbands signed a note to the Dallas bank for $237,605, and appellee executed a mortgage on some property in Fort Worth as additional security for the loan. The sons-in-law had their lives insured for $100,000 each, with the bank as beneficiary, appellee paying the premiums.

Although in the invitation to bids it was stated that the Trustees would convey all of the Estate's right, title and interest in the property without warranty of title, either express or implied, except by passing along the warranties against Wright's predecessors in ownership, before appellants had seen appellee's wire, Sherry told appellee that "we would furnish him the necessary papers to convey good title." Sherry testified: "Q. You just told him you would do whatever was necessary to give him a good title? A. That's right." In the conversation after appellee received Sherry's letter advising him that his bid had been accepted, appellee told Sherry that he must have either a release of the tax lien or a satisfactory showing of solvency of the Estate. Sherry told appellee that the Estate estimated its tax liability of "upwards of ten million dollars," and that appellee would be furnished with a certificate of solvency from the First National Bank of Chicago, or whatever else it took to satisfy appellee,

his attorneys or his bank. On January 21, 1952, appellee wrote Sherry that "It will be necessary * * * for the trustees of the estate to give evidence of the payment of the estate and inheritance taxes, or evidence of solvency. Just as soon as title papers can clear I am prepared to pay for the property." This letter was turned over to Fellows & Fellows, attorneys in Tulsa, who also represented the Estate, and who wrote appellee on January 25, 1952, that the federal tax return had not been made and that "We will have no trouble furnishing you evidence of solvency, however." On March 27, 1952, appellee wrote Fellows & Fellows that "I was assured by you that the estate was solvent and able to meet its taxes and other obligations. Since the First National Bank of Chicago is a trustee, I will be satisfied with a letter from that bank to such effect." Fellows & Fellows wrote appellee on April 8, 1952, that the First National Bank of Chicago had not acted as Trustee as to the properties in the residuary trusts, and was "not qualified to know the facts as to the payment of taxes, etc. The attorneys, therefore, furnished me with their own statement, which I enclose."

The statement enclosed was a letter by Hopkins, Sutter, Halls, DeWolfe & Owen, the Chicago attorneys for the Estate, to Fellows & Fellows. It was dated April 1, 1952, and said: "All claims against the Estate, other than taxes due to other states, have been paid in full and the Estate is solvent and able to meet its taxes and other obligations. We are writing you this letter instead of getting a letter from the First National Bank of Chicago since it is not yet acting as trustee of the residuary trusts, under the last will and testament of Warren Wright, Deceased." Appellee was never given a certificate of solvency by the Chicago bank.

Miss Heraty, an employee of the Estate, testified that the Estate borrowed $3,000,000 in March, 1952, and that she did not know when it was repaid, but it was a short-term loan. It was not shown that this loan had been repaid when the Chicago attorneys wrote Fellows & Fellows that all claims against the Estate, other than taxes due other states, had been paid in full. Miss Heraty also testified that the First National Bank of Chicago had been acting as Trustee since May, 1951.

On November 12, 1952, appellee had his attorney write appellant's Dallas attorney, the Tulsa attorneys, and the Chicago office of the Estate that he was no longer interested in the transaction. At that time, the Estate had not cleared its property of the tax liens. This was not done before November 10, 1954. When the property was sold by the Estate to Humble in 1953, the Estate owed close to $500,000 in federal taxes.

We have reached the conclusion that appellee was not bound to pay for the property while it was burdened with the tax lien, and that the court properly entered judgment for him.

■ It seems to be settled that a purchaser is not required to accept a defective title, unless he agrees to do so, or waives his right to insist that evidence of good title be furnished, or becomes estopped to insist upon it. Jones v. Philips, 59 Tex. 609; Upton v. Maurice, Tex.Civ.App., 34 S.W. 642; Diana Oil Co. v. Cayton, Tex.Civ. App., 20 S.W.2d 108; Howell v. Rosser, Tex.Civ.App., 32 S.W.2d 380; Burris v. Hastert, Tex.Civ.App., 191 S.W.2d 811; Duke v. Garrett, Tex.Civ.App., 276 S.W.2d 587; 38 Tex.Jur., p. 721, sec. 48; 55 Am. Jur., p. 585, sec. 109. This is so, even though the seller offers security to protect the purchaser against defects. 92 C.J.S. Vendor & Purchaser, § 221, p. 89; Mahoney v. Nollman, 309 Mass. 522, 35 N.E.2d 265.

■ The federal tax lien attached at the time of deceased's death, and was an obligation of the estate, without assessments. Detroit Bank v. United States, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304.

Indeed, it seems that appellants concede that they were obligated to furnish evidence

of good title unless appellee is estopped to rely on that defense, or has waived it. In their brief they say: "It is true that Mr. Sherry testified that the Estate would not expect a purchaser to take a bad title. Mr. Sherry had authority to make that statement from the witness stand and the Estate will stand behind it. However, in view of the terms of the Invitation to Bids, we think that there should be some obligation upon the Defendant to show a bad title before he can claim that title difficulties are a bar to the suit."

The court submitted issues dealing with the alleged waiver and estoppel, which were not answered. Appellants requested other such issues, which were not submitted. If any such issues, submitted or requested, were raised by the evidence, appellee's defense of defective title is not established. We are persuaded, however, that the evidence does not raise any issue of waiver or estoppel as applied to appellee's defense of defective title or his demand for a certificate of solvency from the Bank.

Appellants insist that as appellee never expressed any dissatisfaction with the Chicago attorneys' letter as to the solvency of the Estate, and that after such letter was transmitted to him he had said, " 'I will be ready to close at any time,' " appellee waived his prior repeated demand that he be furnished the certificate from the Bank. This certificate had been promised by Sherry before appellee's bid was accepted, when he could have withdrawn it. And the first time appellee said he was ready to close was by his letter of January 21, 1952, when he coupled that statement with the words, "Just as soon as title papers can clear." Again, in a letter to the Tulsa attorneys dated March 14, 1952, appellee said, "We are prepared to pay off any time we can get the title finally approved."

■ Having repeatedly demanded the certificate which had been promised him before his bid was accepted, we are not prepared to hold that an issue of waiver was raised by appellee's failure to mention or repudiate the letter by attorneys for the Estate to other attorneys for the Estate. But if it may be said that such failure could ever be evidence of the fact of waiver, it is demonstrated that the letter was inaccurate in its statement of the facts, and a waiver of rights induced by inaccurate information amounts to no waiver at all. The rule is that one cannot be bound by a waiver unless it be made with full knowledge of the rights he intends to waive and of all the facts and circumstances affecting such rights. Ferguson v. Mounts, Tex.Civ.App., 281 S.W. 616; Payne v. Beaumont, Tex.Civ.App., 245 S. W. 94; Szanto v. Pagel, Tex.Civ.App., 47 S.W.2d 632; Baldridge v. Cook, 27 Tex. 565, 566; Black, Rescission and Cancellation, Vol. 2, sec. 591; 27 R.C.L. 908; Monroe Motor Express v. Jackson, 74 Ga.App. 148, 38 S.E.2d 863.

■ Waiver is the intentional relinquishment of a known right with or after a knowledge of the facts. 92 C.J.S., Waiver, p. 1046. " * * * no one can be said to have waived that which he did not know, or should have known, or to have waived a right, benefit, or advantage, where he acted under a misapprehension of the facts, especially where he had been put off his guard or misled by the conduct of the other party * * *." 92 C.J.S., Waiver, p. 1058. See also, 43–B Tex.Jur., p. 485, sec. 9; White v. Cooper, Tex.Civ. App., 145 S.W.2d 298; Bering Mfg. Co. v. W. T. Carter & Bro., Tex.Civ.App., 255 S.W. 243; Hunter v. Baker Motor Vehicle Co., D.C., 225 F. 1006.

■ The Tulsa attorneys told appellee on January 25 that "We will have no trouble furnishing you evidence of solvency." Notwithstanding that statement, appellee told them on March 27 that "I was assured by you that the estate was solvent and able to meet its taxes and other obligations. Since the First National Bank of

Chicago is a trustee, I will be satisfied with a letter from that bank to such effect."

The Chicago attorneys' letter was not addressed to appellee. They assured him of nothing. It was addressed to Fellows & Fellows, the Estate's attorneys, not appellee's. Some of its statements were ambiguous and others incorrect. It said that "All claims against the Estate, other than taxes due to other states, have been paid in full and the Estate is solvent and able to meet its taxes and other obligations." There could hardly be "other obligations" if taxes "due to other states" constituted the only claims. At that time the unsatisfied federal tax lien was nearly $500,000. Less than a month before the letter was written, the Estate had borrowed $3,000,000 which appears not then to have been repaid. The letter said that the Bank had not acted as trustee of the residuary trusts. It had acted as a Trustee of the Estate every time any Trustee had acted. According to Miss Heraty, every meeting of the Trustees was held in the Bank, with the Bank in active participation. The Bank kept the minutes of the meetings. The Bank was one of the Trustees who employed Sherry to procure offers, and was one of the Trustees who accepted appellee's bid. If the Bank had not acted as Trustee, there was no action by the Trustees, and, if none, appellee's bid would appear never to have been accepted.

Appellee told appellants he wanted the tax lien released or the letter from the Bank. He told his bank, when it agreed to lend the buyers $237,605 to pay for the property, that a certificate of the solvency of the Estate would be furnished by the First National Bank of Chicago. There is no evidence that he ever told anybody that he would be satisfied with less than a release of the tax lien or a certificate of solvency from the Bank. Charles R. Fellows, one of appellants' attorneys, who corresponded with appellee by letters and by telephone, testified that appellee demanded three things, namely, properly executed deeds to his daughters, properly executed transfer orders to the Dallas bank, and a certificate of the solvency of the Estate from the Chicago bank, and that appellee never told him that he would waive the certificate. The transfer orders had been procured and the deeds prepared and signed before July 1, 1952.

On November 14, 1952, two days after appellee withdrew from the negotiations, appellants' Dallas attorneys wrote appellee saying that they were tendering the deeds and called upon him to pay $237,605. On December 31, 1952, the same attorneys wrote appellee's attorney, sending appellee a copy of the letter, that unless they heard from appellee's attorney by January 6, 1953, the property would be sold to Humble for $185,464, and that the Estate would hold appellee responsible for $52,141, the difference between Humble's offer and appellee's bid. The attorneys did not, however, tender a certificate from the Chicago Bank.

■■ The evidence does not reflect the elements of an estoppel. It is not shown that appellants were induced to do anything by appellee's failure to repudiate the letter from the Estate's attorneys to other attorneys for the Estate. Moreover, as in case of waiver, it is an indispensable requisite that the party sought to be estopped must have had knowledge of the material facts at the time of the act or omission claimed to constitute the estoppel. 31 C. J.S., Estoppel, § 70, p. 264. The material facts must have been unknown to the party claiming the benefit of the estoppel, and must have been known to the party against whom the estoppel is claimed. Hunt v. W. O. W. Life Ins. Soc., Tex.Civ.App., 153 S. W.2d 857; 17 Tex.Jur., pp. 138–144.

There never has been a time since appellee made his bid that appellants could have delivered a title free of defects. There was a lien against the Estate of nearly $500,000 when the property was sold to Humble; and since that sale, appellants could not

have delivered anything. Appellee was entitled to assurance not only that he could hold the property, but that he could hold it in peace. 43–A Tex.Jur., p. 186, sec. 162.

Believing that the trial court entered the correct judgment, it is affirmed.